**UNITED STATES of America,**
**Appellee,**

v.

**Steven MADORI, Defendant–Appellant,**

**Charles Chiapetta Defendant.**

**Docket No. 03–1526.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 31, 2005.

Decided: Aug. 19, 2005.

Adam B. Siegel, Assistant United States Attorney, (Diane Gujarati, Assistant United States Attorney, on the brief) for David N. Kelley, United States Attorney for the Southern District of New York, NY, for Appellee.

Robert A. Culp, for Defendant–Appellant.

Before: POOLER, B.D. PARKER Circuit Judges, CASTEL District Judge.*

## INTRODUCTION

B.D. PARKER, Circuit Judge.

Steven Madori appeals his conviction in the United States District Court of the Southern District of New York (Lynch, *J.*) for extortionate extension and collection of credit and for conspiracy. *See* 18 U.S.C. §§ 892, 894 and 371. He attacks his loansharking conviction principally on the ground that the government adduced insufficient proof that he was party to an understanding that force would be used to collect the loans. Also, he contends that he should have been granted a new trial because the government withheld *Brady* and *Giglio* material relating to the cooperation of his codefendant, Charles Chiapetta, under circumstances that evidenced, or at least created the appearance of, the trial judge's partiality. Finally, Madori challenges his sentence—correctly—on the ground that his term of supervised release exceeded the statutory maximum. We affirm Madori's conviction, but remand for correction of this sentencing error.

## BACKGROUND

### I. Facts

The evidence at trial established that in 1998 a businessman named Norman Meisenberg was experiencing serious financial difficulties and was unable to raise money through legitimate sources. He therefore decided to turn to loansharks and asked an acquaintance, Jeffrey Troncone, for assistance. Troncone, who had used Madori and Chiapetta in the past, agreed to arrange an introduction but warned Meisenberg that "they are really not nice people, if you understand what I mean, they are the last people you would want to go borrow any money from, they are just not what you want to do." He also told Meisenberg "to be very careful ... because these were very bad people, very connected people."

Subsequently, Troncone introduced Meisenberg to Chiapetta, who agreed to arrange a $10,000 loan. Chiapetta explained the terms: Meisenberg would have to pay three points, i.e. $300, in interest each week and none of the interest payments would reduce the outstanding principal, which would have to be repaid in a lump sum. Chiapetta concluded the meeting by telling Meisenberg that Chiapetta had to speak to "someone" and would have to get back to Meisenberg. At a second meeting, Chiapetta gave Meisenberg $10,000 in cash and told Meisenberg that if he did not make his weekly interest payments, he "would have a big problem."

---

* The Honorable P. Kevin Castel, United States District Court for the Southern District of New York, NY, sitting by designation.

A few weeks after he received the $10,000, Meisenberg requested an additional $5,000. This time Chiapetta took Meisenberg to meet Madori in the back office of the Diamond Club, a topless bar in Port Chester, New York. Madori asked Meisenberg: "Did you get your package?" When Meisenberg said that he had not, Madori told him: "Charlie has it." Madori then told Meisenberg to "do the right thing" and dismissed him. Chiapetta later gave Meisenberg the additional $5,000. This loan raised the weekly interest payments to $450.

For over a year, Meisenberg made timely payments, sometimes delivering the money to Chiapetta, to Madori, or to both. Eventually Meisenberg fell behind and sought to renegotiate the loan to have interest payments counted against the outstanding principal. These efforts failed and after Meisenberg had paid Madori and Chiapetta over $25,000 in interest, he still owed the $15,000 principal. Meisenberg then turned to the FBI. He agreed with the FBI to record future conversations with Madori and Chiapetta. FBI agents also observed and photographed meetings with Madori, Chiapetta and Meisenberg.

At a July 20, 1999 meeting with Chiapetta, Meisenberg tendered a partial payment. He was four weeks behind on interest payments and Chiapetta told Meisenberg: "[W]hen I give this [partial payment] to somebody he's not gonna like it one bit." Meisenberg later testified that he understood the "somebody" to be Madori. The following week Meisenberg met with both Madori and Chiapetta about the loan. During the meeting, Chiapetta deferred to Madori when making a proposal about repayment, and Chiapetta stated that what he proposed "could be overruled" by Madori. Chiapetta also warned Meisenberg at the meeting that the alternative to payment was "punishment." The FBI recorded and conducted surveillance of this meeting.

On September 8, 1999, Meisenberg had his final meeting with Madori and Chiapetta. Meisenberg had not made interest payments for several weeks. Madori graphically expressed his frustration at this delay (in words that would later be played to the jury), telling Meisenberg: "You're out of time," "I hope you're not just buying yourself two more weeks, Norman," and "[Y]ou're in the fucking red zone now. You got my nuts real twisted by jerking us off for five weeks. Because it becomes a non-money issue now it becomes a principle issue and that's when you go into the danger zone, when it becomes principle instead of money." Not surprisingly, at trial Meisenberg testified that he understood these statements to be threats.

Evidence that was not made public until after the trial indicated that during this period, Chiapetta was under investigation by the United States Attorney's office for the Eastern District of New York for unrelated federal tax crimes, and was providing information to the FBI. Subsequently, he was indicted in the Eastern District. Around May 1998, Chiapetta informed the FBI that Madori had requested that Chiapetta "put some money on the street" and he requested permission of the FBI to do so. The FBI then inquired whether Chiapetta would agree to testify concerning the loansharking activity. Chiapetta refused. The FBI informed him that in order to receive authorization to engage in any loansharking activity, he would have to agree to testify and since he had refused, he had no authority to engage in any such activities. In direct contravention of these instructions, Chiapetta—unbeknownst to the government—engaged in loansharking activities with Madori. On appeal, Madori

maintains that this information constitutes *Brady* and *Giglio* material that should have been disclosed to him earlier.

## II. Proceedings Below

In March 2002, Madori and Chiapetta were indicted on various loansharking and conspiracy charges in the Southern District of New York. In November 2002, Chiapetta filed a sealed severance motion contending that he was a confidential informant at the time of the conduct charged in the indictment. Significantly, Chiapetta acknowledged that while he had been cooperating with the government on unrelated matters, he did not have authorization from the government to engage in loansharking activities with Madori. He contended that his relationship with Madori was "solidified during [his] cooperation" and that it would have been discovered if he had refused to participate in the loansharking. The District Court denied the motion and Chiapetta subsequently pled guilty.

In January 2003, the government moved *ex parte* for a protective order excusing it from revealing information about Chiapetta's prior cooperation with the government. *See* Fed. R.Crim. Pro. 16(d)(1). The motion was submitted under seal because the District Court had previously ordered that certain information regarding Chiapetta's cooperation with the government be sealed.[2] While acknowledging its obligation to produce to Madori *Brady* and *Giglio* material, the government argued that certain information in its possession regarding Chiapetta's cooperation in the Eastern District should not be disclosed to Madori because it lacked impeachment value and because its disclosure would endanger Chiapetta. The government stressed

that the information was not impeachment material because Chiapetta had received no benefit from the government for his loansharking activities and consequently had no incentive to shade any testimony he might give in the government's favor.

In response to this application, the District Court, after what it termed an "unusual" *ex parte* hearing, denied the *ex parte* motion for a protective order. The court concluded that, at that point in the proceedings, the limited record was insufficient to order the government to turn over the material, even on the assumption that the court had the power to do so, stating: "[T]he critical issue in connection with potentially after the fact." *United States v. Madori*, No. S2 02 Cr. 274(GEL), 2004 WL 2274756, at *8, 2004 U.S. Dist. LEXIS 21781, at *26 (S.D.N.Y. Oct. 7, 2004) (internal quotation marks omitted) ("*United States v. Madori*"). The court emphasized that it was undisputed that Chiapetta's cooperation with the government did not encompass his involvement in loansharking activities with Madori, and that consequently this relationship lacked impeachment value. The court then "urged the Government to re-evaluate its case with a view to minimizing evidence or arguments that would make Chiapetta's credibility a significant issue in the case." *Id.* at *8, 2004 U.S. Dist. LEXIS 21781, at *25.

The government proceeded to trial against Madori in February 2003. Meisenberg testified about his dealings with Madori and Chiapetta. The jury also heard testimony by Troncone about his own loans as well as his role in assisting Meisenberg in obtaining loans from Madori and Chiapetta. Meisenberg testified that Troncone told him that Madori and Chia-

---

**2.** The District Court, in proceeding *ex parte*, believed that Chiapetta's safety was a significant concern. It declared during the *ex parte* hearing: "there is, moreover, reason to believe that exposing Chiapetta's past cooperation would put his life in danger."

petta were "very bad people, very connected people." Meisenberg was then permitted to testify that he "understood 'connected' to mean that they would be connected to the Mafia, organized crime . . . ." This testimony was accompanied by an appropriate limiting instruction.

Vital to the government's proof at trial were recordings it played for the jury of Meisenberg's conversations with Madori and Chiapetta concerning the loans and the possible consequences of Meisenberg's failure to repay them. The trial went on for four days, and on the fifth day the jury found Madori guilty on all counts. In August 2003, the court sentenced him principally to 51 months incarceration and five years of supervised release.

Chiapetta was sentenced after Madori. At sentencing, Chiapetta sought a downward departure on the ground that he had been importuned by Madori and that he would not have been exposed to prosecution on the loansharking charge but for his cooperation with the FBI. Chiapetta argued that when Madori approached him about loansharking he reported the approach to the FBI and sought to cooperate, but could not reach an agreement with the government.

The court denied the request for this downward departure. The court noted that Chiapetta threatened Meisenberg, acted both as a loanshark and as a collector, and had not done so under duress. The court concluded that Chiapetta was not entitled to a downward departure based on cooperation with the government:

> "[R]ather than providing assistance in investigating this crime by agreeing to cooperate and testify, [Chiapetta] involved himself in the crime without either operating at the [FBI] agent's direction or providing the FBI with any details of the offense that would have allowed law enforcement to frustrate the

crime. Instead, it's undisputed that the agents never would have learned of this specific crime or of any particular loan activities by Madori that were concrete and prosecutable if Meisenberg had not reported his victimization." *United States v. Madori*, at *8, 2004 U.S. Dist. LEXIS 21781, at *29. The court sentenced Chiapetta principally to twenty-four months in prison.

### III. Motion For a New Trial

Following his conviction, Madori moved for a new trial, contending that the government's evidence that he had participated in extortionate credit transactions was insufficient to sustain his convictions for conspiracy to extortionately extend and extortionate extension of credit. By this time, Chiapetta's sentencing proceedings, detailing his cooperation with the FBI, had become public and Madori argued that the information relating to Chiapetta's cooperation was *Brady* and *Giglio* material, the concealment of which had denied him a fair trial. *See* Fed.R.Crim.P. 33. Specifically, Madori argued that, had the information been disclosed, he would have pursued an alternate trial strategy that focused on the relationship between Chiapetta and the government. For example, Madori said that he would have attempted to show that Chiapetta was an unreliable witness because his involvement with the government gave him an incentive to minimize his own involvement with the loans and to make Madori appear to be the dominant player in the loansharking enterprise. In addition, Madori contended that he could have argued to the jury that Chiapetta somehow entrapped him. The government responded in a submission setting out what had transpired between it and Chiapetta in the Eastern District and explaining why, in its view, the documents concerning that relationship were not required to be disclosed.

The District Court denied the motion for a new trial principally on the ground that the evidence at trial "proved overwhelmingly that Madori participated in the making and collection of an extortionate loan to ... Meisenberg." *United States v. Madori*, at *1, 2004 U.S. Dist. LEXIS 21781, at *3. The court pointed to the thinly veiled (and recorded) threats made by Madori to Meisenberg, and concluded that a "reasonable jury could easily have found implicit threats in Madori's repeated questioning," *id.* at *2, 2004 U.S. Dist. LEXIS 21781, at *8, and in other comments made by Madori. The court found that the information about Chiapetta's relationship with the government was not *Brady* information because it was not material to Madori's conviction. *Id.* at *8, 2004 U.S. Dist. LEXIS 21781, at *36. The court further rejected Madori's assertion that, had he been aware of Chiapetta's prior cooperation, Madori could have argued that Chiapetta intentionally minimized his own criminality and highlighted Madori's when he was dealing with Meisenberg. The Court held that the record "utterly refuted such a suggestion." The court similarly rejected Madori's contention that disclosure of the information would have enabled him to mount an entrapment defense, noting that "there is nothing whatever in this record that provides any likelihood at all that an entrapment defense would succeed." *Id.* at *13, 2004 U.S. Dist. LEXIS 21781, at *42. The court rejected Madori's argument that no valid reputation was offered. This appeal ensued.

## DISCUSSION

Madori attacks his conviction on the ground that the government did not adduce evidence sufficient to prove that he was party to an understanding that force would be used to collect the loans. Additionally, Madori argues that the District Court erred in denying him a new trial after the information about Chiapetta's participation with the government was revealed. Finally, he argues that there was a sentencing error, and his term of supervisory release should be reduced. We reject Madori's first two challenges, but remand to allow the District Court to correct the sentencing error.

## I. Sufficiency of the Evidence

■ Madori contends that the government presented insufficient evidence that he shared with Meisenberg an understanding that force would be used to collect the loans in the event of non-payment. We review *de novo* a challenge to the sufficiency of evidence and "affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir.2004). A defendant challenging a conviction based on a claim of insufficiency of the evidence thus bears a heavy burden. Applying this standard, we see no basis for overturning Madori's conviction.

The government can prove that a loan is extortionate by proving that the loan is "the understanding of the creditor and the debtor at the time [the extension of credit] is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6). Recognizing that it is frequently difficult directly to prove the understanding of the creditor, Congress provided in § 892(b) that the government has presented *prima facie* evidence that a loan is extortionate "if it is shown that all the following factors were present in connection with the extension of credit in

question ...." Those factors are (1) the loan was unenforceable through civil judicial process, (2) the extension of credit was made at an annual rate of interest in excess of 45 percent per year, (3) that at the time, the debtor reasonably believed that the creditor had used extortionate means in the past or had a reputation for the use of extortionate means and (4) that the amount was greater than $100. 18 U.S.C. § 892(b). Section 892(b) "creates a permissive inference or presumption[,] namely, one which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." *United States v. Curcio*, 712 F.2d 1532, 1540 (2d Cir.1983) (internal quotation marks and citations omitted).

■ Because the government must establish that the debtor understood at the inception of the loan that a threat of violence existed, *see United States v. Allen*, 127 F.3d 260, 263 (2d Cir.1997), adequate proof of the debtor's state of mind at the time of the loan is relevant and indeed essential. Proving that both parties knew at the time that the loan was "extortionate" requires the government to establish that Meisenberg understood that a threat of violence existed. Consequently, adequate proof of Meisenberg's state of mind at the time of the loan is relevant—and indeed essential—under § 892. For these reasons, a debtor's belief that a creditor is connected to organized crime may be introduced since it evidences the debtor's understanding that a threat of violence exists. *See United States v. Gigante*, 729 F.2d 78, 83 (2d Cir.1984).[3]

■ Proving an understanding does not require proof of an express agreement as to the use of force or violence. Rather, in this context, the term simply means that both parties comprehended that a threat of violence existed. As the Seventh Circuit has explained:

"Clearly, Congress could not have intended to punish only those loan sharks foolish enough to make the terms of the loan explicit and to exempt those who convey the nature of the transaction by subtle hints and innuendo. Where the threat of violence exists and is comprehended by the victim, the extortionate nature of the transaction is present and punishable under this statute." *United States v. Annoreno*, 460 F.2d 1303, 1309 (7th Cir.1972); *see also United States v. Zizzo*, 120 F.3d 1338, 1353–54 (7th Cir. 1997).

■ Madori contends that the government's proof was insufficient because it failed to show, that at the time of making the loan, he shared or joined an understanding that a failure to pay could result in force. In support of this contention he argues that he was not present at the meeting where Chiapetta gave Meisenberg the first $10,000 and, although he was present when the next $5,000 was provided, the government did not prove he understood that the loan would be extortionate.

We disagree. The government demonstrated that Madori was involved in the loan from its inception. Its proof permitted the jury to conclude that Chiapetta could not have extended the first loan to Meisenberg without first checking with

---

**3.** Because the government introduced evidence that Troncone told Meisenberg that Madori was "connected," in the form of testimony by Meisenberg and Troncone, we also reject Madori's contention that the court erred in giving a charge allowing the jury to presume that the debtor understood that a threat of violence was involved in the extension of credit if the debtor knew that the creditor had a reputation for the use of extortionate means to collect.

"somebody" and that "somebody" was Madori. When Meisenberg sought an additional $5,000, he was summoned to the Diamond Club to meet in person with Madori who told him to collect his "package" from Chiapetta. Madori then told Meisenberg to "do the right thing." Madori was also involved in loan collections: He traveled to Manhattan to collect them, sometimes alone and sometimes with Chiapetta.[4] Madori was clearly aware that the loans were made in cash, in a night club, bore an interest rate of 150 percent and were undocumented.

Tellingly, the most substantial indication of Madori's involvement came from the recorded conversations that permitted the jury to hear Madori's threats in his own words. In a recording of a July 27, 1999 conversation, Madori made clear that the money was owed to him and that he would not have lent the money if Meisenberg had initially proposed to borrow it for the length of time that was being requested. Madori used strong, explicit language with Meisenberg that a jury could have found to have been threatening and to have insinuated—indeed promised—that force would be used to collect the loans. *See United States v. Dennis*, 625 F.2d 782, 799, 803 (8th Cir.1980) ("In loansharking cases, the use of implicit rather than explicit threats, plus the unwillingness of most victims to testify, forces the prosecution to prove the extortionate 'understanding' by circumstantial evidence. . . . Congress provided special evidentiary provisions which allow the prosecutor to show this understanding by circumstantial evidence.").

On the basis of this evidence concerning the manner in which the loan was arranged, extended, and collected, a reasonable jury could conclude that Madori was engaged in an extortionate transaction involving threats of force.

## II. Admissibility of Reputational Evidence

Madori also contests the admission of testimony by Meisenberg that Troncone had told him that Madori was connected to organized crime. Madori argues that Federal Rule of Evidence 404 forbids this testimony because it speaks to "a trait of character . . . for the purpose of proving action in conformity therewith . . . ." Fed. R.Evid. 404(a).

■■ Evidentiary rulings are reviewed for abuse of discretion. *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir.2001). Furthermore, a trial judge's decision to admit evidence is subject to harmless error analysis. *See United States v. Gallego*, (no italics) 191 F.3d 156, 168–69 (2d Cir.1999); *United States v. Han*, 230 F.3d 560, 564 (2d Cir.2000); *United States v. Tubol*, 191 F.3d 88, 96–97 (2d Cir.1999) ("We reverse only if the government is unable to demonstrate that the error was harmless, that is, that the error did not affect the defendant's substantial rights or influence the jury's verdict.") (citations omitted).

■ The trial court did not abuse its discretion by admitting this portion of Meisenberg's testimony. Reputational evidence is expressly permitted by § 892(b)(3). It specifically contemplates that the trial court may admit evidence that "at the time the extension of credit was made, the debtor reasonably believed" either (1) that his creditor had collected or attempted to collect extensions of credit by extortionate means or had punished nonpayment by extortionate means, or (2) that the creditor had a reputation for using

---

4. We agree with the First Circuit that post-extension actions may sometimes be relevant to demonstrate a creditor's state of mind at the time of the extension. *See United States v. Lamattina*, 889 F.2d 1191, 1193 (1st Cir. 1989).

extortionate means to collect extensions of credit or to punish nonpayment. 18 U.S.C. § 892(b).

■ Evidence that the creditor used threats—even veiled ones—and that the debtor believed the creditor was connected to organized crime is admissible to show the debtor's belief that the lender would use, or had a reputation for using, extortionate means to collect extensions of credit. *See, e.g., Gigante,* (no italics) 729 F.2d at 83.

### III. Brady and Giglio Material

■ The government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There are three components of a *Brady* violation: The material evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir.2004). The government's duty to disclose is not limited to "exculpatory" information, it also includes information that could be used to impeach government witnesses, so-called *Giglio* material. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Although the evidence concerning Chiapetta's cooperation with the government was not produced by the government, we find that the evidence itself was not material, and thus the non-disclosure offends neither *Brady* nor *Giglio.*

■ For *Brady* purposes, information is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

*Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *See id.* (internal citations omitted); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Kyles v. Whitley,* (no italics) 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that the state's obligation under *Brady* turns on the "cumulative effect of all such evidence suppressed by the government"); (no italics) *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir.1995).

■ Materiality in this context presents us with a mixed question of law and fact. *See United States v. Rivalta,* 925 F.2d 596, 597–98 (2d. Cir.1991); *United States v. Orena,* 145 F.3d 551, 553–57 (2d Cir.1998). While the trial judge's factual conclusions as to the effect of nondisclosure are entitled to great weight, we examine the record *de novo* to determine whether the evidence in question is material as a matter of law. *See Orena,* (no italics) 145 F.3d at 557–58; *Payne,* 63 F.3d at 1209; *United States v. Provenzano,* 615 F.2d 37, 47 (2d. Cir.1980).

■ Madori contends that the information was material because he could have used the fact of Chiapetta's dealings with the FBI as the basis for an entrapment defense, to undermine the claim that Madori was a co-conspirator and to attempt to impeach Chiapetta if he testified.

As the District Court properly concluded, in light of the substantial evidence of Madori's involvement, none of these strategies was sufficiently plausible to create the "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ritchie,* 480 U.S. at 57, 107 S.Ct. 989.

As we noted, the evidence at trial demonstrated that Chiapetta was working for Madori, so he was not in a position to control or direct Madori's actions. Because Chiapetta was engaging in loansharking without the FBI's approval—conduct for which he was ultimately convicted—we fail to see how knowledge that the government had previously turned down his request to engage in loansharking activity would supply a plausible motive for him to falsely implicate Madori. As the District Court noted, the prospect of testimony that Chiapetta had induced Madori into making the loans was implausible. Testimony by Madori along these lines could have subjected him to cross-examination on his rich criminal background—including convictions for gambling, tax evasion, and usury. The District Court also noted that Madori's "enthusiastic participation in the offense himself" would likely defeat any such argument. *United States v. Madori*, at *13, 2004 U.S. Dist. LEXIS 21781, at *45. Similarly, we fail to see how an entrapment defense could have been developed. Chiapetta was not acting for the government; he was acting contrary to the FBI's instruction and without its knowledge with respect to the loansharking. In any event, Madori made no showing of any inducement by the government to engage in these illegal activities.

We agree with the District Court that nothing about Chiapetta's status as a government cooperator was "remotely relevant to any effort to exculpate Madori of any of the elements of extortionate loan collection based on [Madori's own] actions, or could make it any more likely that Madori would be acquitted on this charge." *Id.*, at *11, 2004 U.S. Dist. LEXIS 21781, at *37. In addition to the vivid tape-recorded threats, the jury also heard testimony from Meisenberg and Troncone that established Madori's reputation as a loans-

hark, his determination of the payment scheme and his threats against Meisenberg and Troncone.

 For essentially the same reasons, we agree that the information did not constitute *Giglio* material. *Giglio* stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial. Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998). We agree with the District Court that the trial evidence makes clear that "Madori was convicted here based on his own words, and not based on any 'testimony' by Chiapetta or acts of Chiapetta attributed to him." *United States v. Madori*, at *13, 2004 U.S. Dist. LEXIS 21781, at *36. The District Court went on correctly to conclude that the accumulated evidence against Madori "demolishes the theory that Chiapetta's informant status was materially exculpatory because it constituted impeachment evidence in the sense defined in *Giglio*." *Id.* at *13, 2004 U.S. Dist. LEXIS 21781, at *36. For these reasons we conclude that the information in question was not material and no *Brady* or *Giglio* violation occurred.

## IV. Ex Parte Proceedings

Madori also contends that not only did the government's *ex parte* application to the court and the court's initial sealing of records pertaining to Chiapetta result in suppression of *Brady* and *Giglio* information, but these actions also resulted in the appearance of partisanship on the part of the District Court which merits a new trial.

During criminal trials, *ex parte* contacts between a party and the trial judge are nearly always problematic in light of the Sixth Amendment's guarantee of a public trial. However, limited exceptions are permissible, under appropriate circumstance. *See United States v. Arroyo–Angulo,* 580 F.2d 1137, 1145 (2d Cir.1978) (closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided."); *see also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Hence, our task is to determine whether the procedures adopted in the District Court concerning the *ex parte* proceedings with the government crossed the line.

■■■■ Even where a compelling necessity for secrecy exists, it must be weighed against the extent of the intrusion, if any, upon the interests of the excluded defendant. *See, e.g., Arroyo–Angulo,* 580 F.2d at 1142; *United States v. Moten,* 582 F.2d 654, 661 (2d Cir.1978). In this case, the government submitted its petition for a protective order *ex parte* because the District Court, when denying Chiapetta's severance motion, had ordered that motion sealed since Chiapetta had contended—quite reasonably—that disclosure of his cooperation would have endangered his life.

Accordingly, when we weigh the prejudice to Madori of withholding information that we have assessed to be immaterial to the case or charges he was convicted of against the trial court's concern for Chiapetta's safety, we find no error in this limited *ex parte* proceeding, and no appearance of partiality by the District Court. We therefore see no reason for the case to be assigned to a different judge, as Madori requests.

## V. Sentencing

■■■ Finally, on appeal for the first time, Madori points to a plain error in his sentence. The substantive statutes under which he was convicted are Class C felonies since they carry maximum statutory sentences of 20 years. 18 U.S.C. § 3559(a)(3). The statutory provision providing for supervised release allows "not more than three years" for Class C felonies. 18 U.S.C. § 3583(b)(2). Madori, however, received five years supervised release. We thus vacate and remand Madori's sentence to the District Court to address this error. *United States v. Crosby,* 397 F.3d 103, 114 (2d Cir.2005) (distinguishing between a *Crosby* remand and a remand for resentencing "if a sentencing judge committed a procedural error by selecting a sentence in violation of applicable law, and that error is not harmless and is properly preserved or available for review under plain error analysis.") (citing *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)); *see also United States v. Carmichael,* 216 F.3d 224, 228 (2d Cir.2000) (identifying as plain error the district court's erroneous assumption that statutory minimum supervised release term was five years and not the four years mandated by the offense of conviction, and vacating and remanding for resentencing).

### CONCLUSION

For the foregoing reasons the judgment of the District Court is affirmed, except that the sentence is vacated and remanded for further proceedings consistent with this opinion.