United States v. Sekhar

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: April 16, 2012      Decided: June 26, 2012)

Docket No. 11-4298

- - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

          Appellee,

      - v.-

GIRIDHAR C. SEKHAR,

          Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - -x

    Before:        JACOBS, Chief Judge, B.D. PARKER and
                    HALL, Circuit Judges.

Giridhar Sekhar appeals his conviction, following a jury trial in the Northern District of New York (Thomas J. McAvoy, Judge), for [i] attempted extortion of the General Counsel of the New York State Comptroller's Office in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and [ii] interstate transmission of extortionate threats in violation of 18 U.S.C. § 875(d). Sekhar argues that his conduct did not come within the statutory definition of extortion

because he did not "attempt to obtain property" from the General Counsel. See Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409 (2003) ("Scheidler II") (interpreting 18 U.S.C. § 1951(b)(2)). Sekhar argues that [1] the General Counsel's right to make recommendations was not a property right, and [2] he did not attempt to appropriate or exercise that right. We affirm.

PAUL A. CLYNE, Albany, N.Y., for Appellant.

RAJIT S. DOSANJH, Assistant United States Attorney (Elizabeth C. Coombe, Assistant United States Attorney, on the brief), for Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, N.Y., for Appellee.

DENNIS JACOBS, Chief Judge:

Giridhar Sekhar was convicted following a jury trial in the United States District Court for the Northern District of New York (Thomas J. McAvoy, Judge) of [i] attempted extortion of the General Counsel of the New York State Comptroller's Office in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and [ii] interstate transmission of extortionate threats in violation of 18 U.S.C. § 875(d). Sekhar had threatened to disclose gossip that the General

Counsel was conducting an office affair unless the General Counsel recanted a recommendation to the State Comptroller to reject a proposal by Sekhar's company. On appeal, Sekhar contends that his conduct did not come within the statutory definition of extortion because he did not "attempt to obtain property" from the General Counsel. See Scheidler II, 537 U.S. at 409 (interpreting 18 U.S.C. § 1951(b)(2)). Sekhar argues that [1] the General Counsel's right to make recommendations was not a property right, and [2] he did not attempt to appropriate or exercise that right. We affirm.

**BACKGROUND**

**Investment Process.** The Common Retirement Fund ("Pension Fund" or "Fund") is the employee pension fund for the State of New York and various of its local governments. The State Comptroller is the sole trustee and has final approval over all Fund investments.

If the Comptroller approves an investment, he issues a Commitment. Fund investments are sometimes contingent on a company's attracting other investors, and a Commitment assists that process by signaling the backing of the Pension Fund. But a Commitment does not bind the Fund to invest;

3

for that, the parties must execute and close on a limited partnership agreement.

**Proposed Investment with FA Technology**.  In 2008, the Comptroller issued a Commitment for a $35 million investment in a fund managed by FA Technology Ventures ("FA Technology") known as "FA Tech II."  The investment never closed.  In October 2009, the Comptroller's Office considered another $35 million investment in two FA Technology funds, known collectively as "FA Tech III." Based on the proposed terms, FA Technology would earn nearly $7.6 million in management fees over ten years, and could earn more depending on how the investment performed.

In April 2009, the Comptroller's Office had prohibited investments marketed by placement agents.  Although FA Technology did not use a placement agent for FA Tech III, it had used one for FA Tech II, and the Comptroller's Office questioned the FA Tech III investment on that ground because the investment was "essentially the same" as FA Tech II.

While the General Counsel was considering the issue, he was advised by the Office of the New York Attorney General that it was investigating the placement agent involved in FA Tech II and that the Pension Fund should avoid association

4

with that agent. The General Counsel's internal memo recommended that, "[b]ased on information provided by the Office of the Attorney General . . ., it would be prudent, from a legal perspective, to avoid moving forward" with the FA Tech III investment and warned that the Pension Fund and the Comptroller's Office could be "in a vulnerable situation if the investment were made and a report or other finding of wrongdoing was subsequently issued by the [Office of the Attorney General]." The Comptroller, so advised, decided on November 13 not to approve the investment.

The First Deputy Comptroller conveyed the decision to George Hulecki, a managing partner of FA Technology. Hulecki had previously been informed of the General Counsel's opposition to the investment and of rumors that he was having an extramarital affair.

**Sekhar's Conduct.** On November 17, the General Counsel received an anonymous e-mail to his work account requesting a personal e-mail address to report "a serious ethical issue." He advised the e-mailer to contact the Inspector General, but also provided a personal address. The e-mailer replied to the personal address accusing the General Counsel of "blackball[ing] a recommendation on a fund," and

threatening that if, by November 20, he did not tell the Comptroller that he had a "change of heart" and "recommend moving forward with this fund," the e-mailer would disclose that the General Counsel was having an office affair to the General Counsel's wife, as well as to the Comptroller, the Attorney General, the press, and others.

That night, another e-mail warned the General Counsel that he had "36 hours left . . . [t]o make the wrong right." The next day, a similar e-mail arrived, as well as an e-mail attaching a draft letter to the Attorney General disclosing the alleged affair.

On the advice of law enforcement, the General Counsel asked the e-mailer for more time. On Monday, November 23, the e-mailer assured the General Counsel that he would "never hear about this again" if he could "get this fixed by Wednesday." On Tuesday, December 1, the e-mailer asked the General Counsel what he thought about Tiger Woods: "[W]ho would have thought that a woman could get that upset . . . and over what?" (ellipses in original).

The FBI traced some of the e-mails to the Brookline, Massachusetts home of Sekhar, a managing partner of FA Technology, and executed a search warrant. Sekhar admitted

to sending the e-mails, and forensics confirmed Sekhar's computer as the source.

**Procedural History.**  The indictment alleged that Sekhar wrongfully attempted to obtain the General Counsel's recommendation to approve the Commitment, the Comptroller's approval of the Commitment, and the Commitment itself. Sekhar was charged with one count of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951(a), and six counts of interstate transmission of extortionate threats, id. § 875(d).  Sekhar moved pro se to dismiss the indictment on the ground (inter alia) that it failed to state an offense, see Fed. R. Crim. P. 12(b)(3)(B), because a recommendation is not property, an approval is not property, and the indictment did not allege that Sekhar threatened a person with power to issue the Commitment.  In denying the motion, the court ruled that "the General Counsel's right to make professional decisions without outside pressure is an intangible property right" and that the government need only prove that Sekhar "believed that the General Counsel's recommendation was the determining factor in obtaining the Commitment."

Sekhar, defending pro se, was convicted on the extortion count and on five of the six counts of interstate transmission of extortionate threats.[1]  For each count, the jury indicated on a special verdict form that Sekhar attempted to extort the General Counsel's recommendation to approve the Commitment.

Sekhar, with counsel, moved for a judgment of acquittal or a new trial, based (inter alia) on the sufficiency of the evidence.  See Fed. R. Crim. P. 29(c), 33(a).  The court ruled that there was sufficient evidence that: Sekhar attempted to exercise control over the General Counsel's right to make recommendations; Sekhar believed that this exercise would result in a Commitment; and a Commitment would benefit Sekhar financially.  Sekhar was sentenced to fifteen months' incarceration on each count, to be served concurrently.

**DISCUSSION**

On appeal, Sekhar contends that the indictment failed to state an offense and that the evidence was insufficient to sustain the conviction.  For both contentions, Sekhar's

---

[1] Sekhar was acquitted on the count based on the December 1 "Tiger Woods" e-mail.

argument is the same: His conduct, as alleged in the indictment and proven at trial, did not come within the statutory definition of extortion because he did not "attempt to obtain property" from the General Counsel. See Scheidler II, 537 U.S. at 409 (interpreting 18 U.S.C. § 1951(b)(2)). The standard of review for both contentions is de novo. United States v. Gotti, 459 F.3d 296, 320 (2d Cir. 2006) ("[W]e evaluate the legal issue[] of whether the indictment properly charged Hobbs Act extortion . . . under a de novo standard."); United States v. Madori, 419 F.3d 159, 166 (2d Cir. 2005) ("We review de novo a challenge to the sufficiency of evidence and affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." (internal quotation marks omitted)). Accordingly, we analyze both contentions together.[2]

The Hobbs Act subjects to criminal liability "[w]hoever

---

[2] The Court has sometimes reviewed arguments similar to Sekhar's as challenging the sufficiency of the evidence, see United States v. Cain, 671 F.3d 271, 277 (2d Cir.), cert. denied sub nom. Soha v. United States, 132 S. Ct. 1872 (2012), and sometimes as challenging the indictment, see United States v. Coppola, 671 F.3d 220, 233 (2d Cir.), reh'g denied, No. 10-0065-cr (2d Cir. May 14, 2012); Gotti, 459 F.3d at 320.

in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."  18 U.S.C. § 1951(a).  "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2). The parties agree that this definition also applies to § 875(d), which subjects to criminal liability "[w]hoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee."  See also United States v. Jackson, 180 F.3d 55, 70 (2d Cir. 1999) ("Given Congress's contemporaneous consideration of the predecessors of § 875(d) and the Hobbs Act, . . . we infer that Congress's concept of extortion was the same with respect to both statutes.").

The element of "obtaining . . . property" entails a two-part inquiry: "whether the defendant is (1) alleged to have carried out (or, in the case of attempted extortion, attempted to carry out) the deprivation of a property right

10

from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." Gotti, 459 F.3d at 324 (citing Scheidler II).

                              **I**

"The concept of property under the Hobbs Act . . . is not limited to physical or tangible property or things, but includes, in a broad sense, any valuable right considered as a source or element of wealth . . . ." United States v. Tropiano, 418 F.2d 1069, 1075 (2d Cir. 1969) (citations omitted); accord Gotti, 459 F.3d at 323.

"The right to pursue a lawful business . . . has long been recognized as a property right . . . ." Tropiano, 418 F.2d at 1076. There is a property right to "conduct a business free from threats," United States v. Arena, 180 F.3d 380, 394 (2d Cir. 1999), abrogated in part on other grounds by Scheidler II, 537 U.S. at 403 n.8, and "to make various business decisions . . . free from outside pressure," Gotti, 459 F.3d at 327.

The General Counsel's job was to provide legal advice to the Comptroller. A "lawyer's stock in trade is the sale

11

of legal services." Massaro v. Chesley (In re San Juan Dupont Plaza Hotel Fire Litig.), 111 F.3d 220, 237 n.19 (1st Cir. 1997) (internal quotation marks omitted). What is sold is "time and advice." United States v. Bertoli, 994 F.2d 1002, 1023 (3d Cir. 1993) (internal quotation marks omitted). Accordingly, the General Counsel had a property right in rendering sound legal advice to the Comptroller and, specifically, to recommend--free from threats--whether the Comptroller should issue a Commitment for FA Tech III.[3]

Sekhar argues that the General Counsel's recommendation to approve the Commitment--which the jury found was the object of the attempted extortion--was not a property right enjoyed by the General Counsel because it was not, for the General Counsel, a "source or element of wealth." See Tropiano, 418 F.2d at 1075. According to Sekhar, the government had to show that the General Counsel derived wealth from his ability to make the recommendation or that he would have suffered monetarily had Sekhar succeeded in forcing him to change his recommendation.

---

[3] The government has not argued, and we need not consider, whether the state and local employees whose money was invested in the Pension Fund had a property right to have the General Counsel make recommendations in the best interest of the Fund.

12

The value and worth of a lawyer's services may be said generally to depend on freedom from conflict, including a conflict created by personal blackmail.  Accordingly, the General Counsel's ability to give legal advice free from threats--and, specifically, to make a recommendation on FA Tech III--can be seen as a "source or element of wealth" for the General Counsel.  In any event, as the district court observed, a property right need not be a source of wealth to the *target* of the extortion.

In Gotti, the Court held that the defendants--members and associates of the Gambino Crime Family--deprived union members of their rights under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 501(a), "to free speech[,] . . . democratic participation in union affairs[, and] . . . loyal representation by their officers, agents, and other representatives."  459 F.3d at 325; accord Coppola, 671 F.3d at 234-36; see also United States v. Bellomo, 176 F.3d 580, 592-93 (2d Cir. 1999) ("The right of the members of a union to democratic participation in a union election is property . . . .").  In considering another count, the Court held that the defendants deprived healthcare plan participants of their right to have the

13

plan's "trustees and fiduciaries discharge their duties in [the plan's] best interest." Gotti, 459 F.3d at 326. The Court did not analyze whether these rights were a "source or element of wealth" for the targets of the extortion. Instead, as discussed in Part II, the Court focused on the value of the rights to the defendant extortionists.[4]

## II

"[T]he extortion provision of the Hobbs Act . . . require[s] not only the deprivation but also the acquisition of property." Scheidler II, 537 U.S. at 404. The question becomes "whether the defendants . . . 'pursued [or] received something of value from [victims] that they could exercise,

---

[4] Sekhar cites Town of W. Hartford v. Operation Rescue, 915 F.2d 92, 102 (2d Cir. 1990), for the proposition that "the term 'property' cannot plausibly be construed to encompass altered official conduct." In West Hartford, the Court held that anti-abortion protesters did not engage in extortion by (inter alia) resisting arrest and refusing to identify themselves to police: While these actions caused the town to expend additional resources, "[v]irtually any conduct that elicits a governmental response will require activity by one or more salaried governmental employees." Id. Mere "governmental response to unlawful acts is not 'property' within the meaning of the Hobbs Act." Arena, 180 F.3d at 393 (citing W. Hartford, 915 F.2d at 101-02). In West Harford, unlike the present case, the governmental response was an exercise of the police power, which did not entail a channeling of value or advantage to the benefit of a defendant.

transfer, or sell.'"  Gotti, 459 F.3d at 323 (brackets in original) (quoting Scheidler II, 537 U.S. at 405).  The defendants in Scheidler II, anti-abortion protesters who aimed to shut down clinics, "'may have deprived or sought to deprive [the clinics] of their alleged property right of exclusive control of their business assets,'" but "'there was no basis upon which to find that [the protesters] committed extortion under the Hobbs Act'" because the protesters "'did not obtain or attempt to obtain property from [the clinics].'"  Id. at 322-23 (quoting Scheidler II, 537 U.S. at 405, 409).

The protesters "would have satisfied the Scheidler II Court's definition of 'obtaining'" had they "sought to take further action after having deprived the clinics of their right to conduct their business as they wished--by, for example, forcing the clinic staff to provide different types of services."  Id. at 324.  In such an event, "the victim is ordered to exercise his or her rights in accordance with the extortionist's wishes, such that the extortionist is essentially controlling the exercise of those rights."  Id. at 324 n.9.

15

Accordingly, in Gotti, the Court held that the defendants, by controlling the decisions of union officials, "caused the relinquishment of the union members' LMRDA rights . . . in order to exercise those rights for themselves." Id. at 325; accord Coppola, 671 F.3d at 234-38. Addressing another count, the Gotti Court held that the defendants, by dictating the healthcare plan that union trustees selected, deprived the union members of their rights to have the trustees act as fiduciaries and "exercised the rights . . . in order to profit themselves." 459 F.3d at 326; see also Cain, 671 F.3d at 282 ("[W]hether the property that is the subject of the extortion is valuable in the hands of the defendant . . . will rarely be a problem in cases . . . in which the defendant seeks to exploit the very intangible right that he extracts from the victim.").

Here, as the district court concluded, Sekhar attempted to deprive the General Counsel of his right to make a recommendation consistent with his legal judgment and attempted to exercise that right by forcing the General Counsel to make a recommendation determined by *Sekhar*.

16

As Sekhar points out, a positive recommendation from the General Counsel would not have guaranteed a Commitment, and a Commitment would not have guaranteed an investment. But "'[t]he concept of property . . . does not depend upon a direct benefit being conferred on the person who obtains the property.'" Gotti, 459 F.3d at 320 (quoting Tropiano, 418 F.2d at 1075-76). An extortionist does not necessarily profit by exercising the rights thus obtained; it is enough that "defendants exercise[] the rights in question *in order to profit themselves.*" Id. at 326 (emphasis added).

The defendant in Cain, who used threats and violence to drive his competitors from the market, argued that the government "introduced no evidence that through [his] coercive conduct [he] obtained specific tree service jobs or a quantifiable portion of the tree-service market." 671 F.3d at 279. The Court held that the defendant had committed extortion because his "purpose in using violence against his victims was to acquire the market share held by [his competitors] and to exploit it for his own enrichment." Id. at 283. The Court expressed disagreement with the Ninth Circuit's holding in United States v. McFall, 558 F.3d 951, 957 (9th Cir. 2009), that "[i]t is not enough to gain some

17

speculative benefit by hindering a competitor." 671 F.3d at 283 n.4.

Here, the evidence showed that a positive recommendation by the General Counsel would have increased the chances the Comptroller would issue a Commitment; a Commitment was necessary for FA Tech III to receive a Pension Fund investment; and an investment would have resulted in management fees for FA Technology and profit for Sekhar, as a managing partner. And the evidence showed that Sekhar understood that line of causation. Accordingly, there was sufficient evidence to conclude that Sekhar, in order to profit, attempted to exercise the General Counsel's property right to make recommendations. The government was not required to prove that Sekhar would actually have been enriched had he succeeded in exercising that right. Opportunities have value.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of conviction.

18