18-3074-cr(L)
*U.S. v. Hunter et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2021

Nos. 18-3074-cr (L), 18-3489 (CON), 19-790 (CON)

UNITED STATES OF AMERICA,
*Appellee*,

v.

JOSEPH MANUEL HUNTER, AKA SEALED DEFENDANT 1, AKA FRANK
ROBINSON, AKA JIM RIKER, AKA RAMBO, AKA JOSEPH HUNTER, CARL
DAVID STILLWELL, AKA DAVID STILLWELL, ADAM SAMIA, AKA SAL,
AKA ADAM SAMIC,
*Defendants – Appellants*,

MICHAEL FILTER, AKA SEALED DEFENDANT 2, AKA PAUL, TIMOTHY
VAMVAKIAS, AKA SEALED DEFENDANT 3, AKA TAY, DENNIS GOGEL,
AKA SEALED DEFENDANT 4, AKA DENNIS GOEGEL, AKA NICO,
SLAWOMIR SOBORSKI, AKA SEALED DEFENDANT 5, AKA GERALD,
*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York

Before: CABRANES, RAGGI, *Circuit Judges*, and KORMAN, *District Judge*.[1]

The initial appeals of Defendants-Appellants Carl David Stillwell, Adam Samia, and Joseph Manuel Hunter (together, "Defendants") were interrupted in October 2019, when we became aware that the Narcotic and Dangerous Drug Section ("NDDS") of the U.S. Department of Justice had advised this Court that the District Court for the Southern District of New York (Ronnie Abrams, *Judge*) had entered a sealed protective order upon the filing of a post-trial, *ex parte* motion by the NDDS, which barred prosecutors in the U.S. Attorney's Office for the Southern District of New York ("SDNY") and defense counsel from reviewing certain classified documents.

We vacated the District Court's protective order and ordered those documents disclosed to both parties, leading defense counsel to argue for the first time on appeal that the prosecution had withheld the information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In an opinion of January 27, 2021, we remanded the case to the District Court with a limited mandate to determine, in the first instance,

---

[1] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

"whether any evidence favorable to the Defendants was material, suppressed, or both." *United States v. Stillwell*, 986 F.3d 196, 201 (2d Cir. 2021) ("*Stillwell*").

On remand, Defendants filed motions for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, which the District Court denied in a December 14, 2021 order, and a redacted version of that order was entered December 28, 2021.

With jurisdiction now restored to us, we turn back to Defendants' initial appeals from their judgments of conviction, and address those claims by summary order, entered the same day that this opinion is filed. We write separately here to address claims raised by Defendants Hunter and Stillwell in appealing the District Court's Rule 33 Order. In the unusual circumstances presented by this case, we are skeptical of the Government's argument that the information withheld by the NDDS was not "suppressed" within the meaning of *Brady*. Nevertheless, we find that question unnecessary to resolve because we conclude that Defendants were not prejudiced by the withheld information, and it was therefore not material. Accordingly, we **AFFIRM** the December 14, 2021 order of the District Court denying Defendants' motions under Rule 33.

————

REBEKAH DONALESKI (Emil J. Bove III, Sarah K. Eddy, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United

States Attorney for the Southern District of
New York, *for Appellee*.

ROBERT J. BOYLE (Andrew Patel, *on the brief*),
New York, NY, *for Defendant-Appellant
Hunter*.

ROBERT W. RAY (Brittney M. Edwards,
Thompson & Knight LLP, *on the brief*),
Zeichner Ellman & Krause, LLP, New York,
NY, *for Defendant-Appellant Stillwell*.

Aimee W. Brown (Masha G. Hansford,
Kannon K. Shanmugam, Ethan R. Merel, *on
the brief*), Paul, Weiss, Rifkind, Wharton &
Garrison LLP, Washington D.C. and New
York, NY, *for Defendant-Appellant Samia*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

The initial appeals of Defendants-Appellants Carl David
Stillwell, Adam Samia, and Joseph Manuel Hunter (together,
"Defendants") were interrupted in October 2019, when we became
aware that the Narcotic and Dangerous Drug Section ("NDDS") of the
U.S. Department of Justice had advised this Court that the District
Court for the Southern District of New York (Ronnie Abrams, *Judge*)
had entered a sealed protective order upon the filing of a post-trial, *ex
parte* motion by the NDDS, which barred prosecutors in the U.S.

4

Attorney's Office for the Southern District of New York ("SDNY") and defense counsel from reviewing certain classified documents.

We vacated the District Court's protective order and ordered those documents disclosed to both parties, leading defense counsel to argue for the first time on appeal that the prosecution had withheld the information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In an opinion of January 27, 2021, we remanded the case to the District Court with a limited mandate to determine, in the first instance, "whether any evidence favorable to the Defendants was material, suppressed, or both."[2]

On remand, Defendants filed motions for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, which the District Court denied in a December 14, 2021 order, and a redacted version of that order was entered December 28, 2021.[3]

---

[2] *United States v. Stillwell*, 986 F.3d 196, 201 (2d Cir. 2021) ("*Stillwell*"). We instructed that any further appeals should be returned to our panel. *See id*. at 202; *cf. United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

[3] *United States v. Hunter*, No. 13-cr-521-RA, ECF 796 (S.D.N.Y. Dec. 28, 2021) ("Rule 33 Order"). Prior to this case coming to us on initial appeal, Hunter filed post-trial motions pursuant to Federal Rules of Criminal Procedure 29 and 33, Stillwell filed a post-trial motion pursuant to Rule 29, and Samia joined those motions, all unrelated to *Brady*, which were all denied by the District Court. *See United States v. Hunter*, No. 13-cr-521-RA, 2018 WL 4961453 (S.D.N.Y. Oct. 15, 2018) ("Post-Trial Opinion"). For clarity, we refer to the District Court's October 15, 2018 opinion and order denying those motions as its "Post-Trial Opinion," and we refer to the District Court's December 14, 2021 order denying the Rule 33 motions based on *Brady* claims made following our remand in *Stillwell* as its "Rule 33 Order."

With jurisdiction now restored to us, we turn back to Defendants' initial appeals from their judgments of conviction, and address those claims by summary order, entered the same day that this opinion is filed. We write separately here to address claims raised by Defendants Hunter and Stillwell in appealing the District Court's Rule 33 Order. In the unusual circumstances presented by this case, we are skeptical of the Government's argument that the information withheld by the NDDS was not "suppressed" within the meaning of *Brady*. Nevertheless, we find that question unnecessary to resolve because we conclude that Defendants were not prejudiced by the withheld information, and it was therefore not material. Accordingly, we **AFFIRM** the December 14, 2021 order of the District Court denying Defendants' motions under Rule 33.

## I. BACKGROUND

### A. Murder-for-Hire and Trial

Paul Calder LeRoux ("LeRoux") ran a transnational criminal organization engaged in money laundering, drug and weapons trafficking, and various acts of violence, including murder. The scale and variety of his outrageous criminal conduct defies an easy summary, and includes arms and technology dealings with Iran and North Korea, attempts at minor warlordism in Africa, and the plotting of a coup d'état in the Seychelles. As the District Court has aptly

characterized it, he committed "an array of crimes worthy of a James Bond villain."[4]

In September 2012, the U.S. Drug Enforcement Administration ("DEA") arrested LeRoux in Liberia and he began cooperating with authorities. The DEA used LeRoux's cooperation to target various other members of his criminal organization.

Defendants are among the members of that organization arrested by the DEA and jointly tried on five counts: (1) conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958(a);[5] (2) murder-for-hire, in violation of 18 U.S.C. § 1958(a); (3) conspiracy to murder and kidnap in a foreign country, in violation of 18 U.S.C. § 956(a);[6] (4) causing death with a firearm during and in relation to a

---

[4] Rule 33 Order, No. 13-cr-521-RA, ECF 796, at 22.

[5] "Whoever travels in . . . interstate or foreign commerce, or uses . . . the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so . . . and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both." 18 U.S.C. § 1958(a).

[6] "Whoever, within the jurisdiction of the United States, conspires with one or more other persons . . . to commit at any place outside the United States an act that would constitute the offense of murder [or] kidnapping . . . if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished [by] . . . imprisonment for any term of years or for life." 18 U.S.C. § 956(a).

7

crime of violence, in violation of 18 U.S.C. § 924(j);[7] and (5) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h).[8]

In particular, the Government alleged that in late 2011 and early 2012, Hunter, Samia, and Stillwell conspired to commit murders-for-hire, for which purpose they traveled from the U.S. to the Philippines; that while there, Hunter provided Samia and Stillwell with "target packages" of individuals to kill; and that on February 12, 2012, Samia and Stillwell shot and killed Catherine Lee, a Filipino real estate agent.[9]

At trial, only Samia (who does not now appeal the District Court's Rule 33 Order) maintained his actual innocence. Hunter and Stillwell both admitted involvement in Lee's murder, but argued that the Government had failed to establish the jurisdictional element of

---

[7] "A person who, in the course of a violation of [18 U.S.C. § 924(c)] causes the death of a person through the use of a firearm, shall if the killing is a murder . . . be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j).

18 U.S.C. § 924(c) provides that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence[,] . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years." 18 U.S.C. § 924(c).

[8] "Any person who conspires to commit [a money laundering offense] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h); *see* 18 U.S.C. §§ 1956(a), 1957(a) (defining relevant money laundering offenses).

[9] Joint App'x at 282–83 (Superseding Indictment).

the 18 U.S.C. § 956(a) count, by not demonstrating that they had engaged in the conspiracy while in the U.S.[10]

The Government's case advanced various items of evidence to establish the jurisdictional element of that count. In particular, as relevant to the arguments made by Hunter and Stillwell in appealing the Rule 33 Order, the Government submitted evidence that Hunter had flown to the U.S. on Korean Airlines Flight 35 on December 10, 2011, and that he had met with Stillwell and Samia in North Carolina later that month. Further, LeRoux testified that a previous statement he had made to authorities in 2015 as part of a proffer—that Stillwell did *not* know about the murderous purpose of his trip to the Philippines until *after* leaving the U.S. (the "2015 Statement")—had been a lie.

Following a jury trial in April 2018, the three Defendants were convicted on all counts and sentenced principally to life in prison.[11] Defendants timely filed their initial appeals.

---

[10] The parties agreed that Counts 1, 2, and 4 of the indictment were predicated on Count 3, the 18 U.S.C. § 956(a) count. Post-Trial Opinion, 2018 WL 4961453, at *2 n.4. As is relevant to Defendants' appeal, the District Court instructed that in order to sustain a conviction on that count, the Government had to prove that a defendant "conspired with one or more members of the conspiracy while that defendant was physically present in the United States." Joint App'x 974 (Trial Tr. 2011:10–13).

[11] Hunter was not charged with Count 5. Judgments entered on October 12, 2018 (Stillwell), November 14, 2018 (Samia), and March 25, 2019 (Hunter).

## B. Appeal and Remand

We heard oral argument on the initial appeals of Samia and Stillwell on October 30, 2019.[12]

As we described in *Stillwell*, soon after this, we became aware that in October 2018, the NDDS had filed a notice with this Court advising us that the District Court had entered a sealed protective order in the case barring prosecutors from the U.S. Attorney's Office for the SDNY and defense counsel from reviewing certain classified documents. That protective order had been granted pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 §§ 1 *et seq.*, and Federal Rule of Criminal Procedure 16(d),[13] upon the filing of a post-trial *ex parte* motion by an NDDS attorney, with no notice to counsel of record for any of the parties.

---

[12] Hunter's notice of appeal was filed later, and his case was therefore not consolidated with Samia and Stillwell's until April 30, 2020. On August 11, 2020, we ordered a modified briefing schedule as to Hunter, allowing him and his counsel additional time to receive and respond to disclosures of previously-withheld information. As of November 19, 2020, Hunter's initial appeal was fully briefed, and his counsel was able to argue issues related to the Rule 33 Order and the initial appeal at oral argument before us on March 22, 2022.

[13] *See* 18 U.S.C. app. 3 § 4 ("The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone."); Fed. R. Crim. P. 16(d)(1) ("At any

In *Stillwell*, we described the complete procedural background, including a series of Orders to Show Cause that we subsequently issued, and a series of disclosures that followed.[14] In short, and as is relevant here, we vacated the District Court's protective order and eventually ordered that the withheld information be disclosed, first to the U.S. Attorney's Office for the SDNY, and then to defense counsel.

The supplemental briefing and disclosure we ordered were completed—with some delay due to the COVID-19 pandemic—by December 2020. At that point, Defendants raised their *Brady* claims in our Court.

On January 27, 2021, we issued our opinion in *Stillwell*, remanding the case to the District Court to "consider the *Brady* claims in the first instance on an appropriate post-trial motion by Defendants" and to "determine whether any evidence favorable to the Defendants was material, suppressed, or both."[15]

---

time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.").

[14] *See Stillwell*, 986 F.3d at 198–99.

[15] *Id.* at 201–02.

11

## C. Developments Post-Remand

In the District Court, Defendants submitted motions for a new trial under Rule 33, making *Brady* claims based on the withheld information.

On November 18, 2021, the District Court held a classified hearing on those motions.

Defendants referred to the withheld information to advance a series of arguments about LeRoux and his role in their trial. Two categories of information are relevant to the instant arguments of Hunter and Stillwell on appeal.

First, the withheld information contains what the District Court usefully termed "Management and Manipulation Material"—that is, evidence that LeRoux was in firm control of his criminal empire and that he was willing to deceive, manipulate, and lie in order to advance his own interests.

Many documents tend to show that LeRoux took an active hand in managing his organization. For example, LeRoux appears to have required certain employees to seek his approval before acting, and LeRoux had several in-depth conversations with his associates about wire transfers and other means of moving money. Several other documents tend to show that LeRoux had a detailed knowledge of legal systems and a willingness to manipulate them. For example, LeRoux had discussions with his wife about an investigation he was then facing in Hong Kong; he mentioned the lawyers he had employed

to deal with that investigation, compared his ability to affect the outcome of the investigation in Hong Kong as opposed to the Philippines, and talked about the impact that getting a divorce might have on the investigation.

Second, a particular document reflects a conversation that Stillwell contends is about the disposal of the Lee murder weapon. In the communication, LeRoux had a discussion with an unidentified man, who told LeRoux that he was "going to throw the candles to the river."[16] LeRoux appeared to reply affirmatively, urging him to throw "the other steel shit" in the river. [17]

The parties also submitted information to the District Court about the withheld information itself, including how the government came by the information, what governmental entities possessed that information, and the relationships between those governmental entities and the prosecution of the legal case against Defendants.

In particular, the Government submitted that the DEA agents who possessed the withheld information prior to its disclosure to the parties were members of the DEA's Special Project Section ("DEA-SPS"), whereas the DEA agents who helped build the case against Defendants were members of the DEA's Bilateral Investigations Unit

---

[16] Gov't Br. Ex. B, PC #2012-79691 at 2, *United States v. Hunter*, No. 13-cr-521-RA, ECF 764. Unless otherwise noted, "Gov't Br." refers to the Government's classified memorandum of law filed in the District Court on April 5, 2021 in opposition to Defendants' Rule 33 motions on remand.

[17] *Id.*

13

("DEA-BIU"). The Government submitted an affidavit from the Assistant Special Agent in Charge of the DEA-SPS explaining that while the DEA-SPS and DEA-BIU are both part of the DEA's Special Operations Division [DEA-SOD], they are "separate and distinct" and "[p]ersonnel assigned to the [DEA-BIU] were not read on nor given access to information available to and collected by personnel assigned to the [DEA-SPS]" in this case.[18]

On December 14, 2021, following its classified hearing, the District Court issued its Rule 33 Order denying Defendants' motions.[19]

On December 28, 2021, Hunter and Stillwell filed a motion in our Court to recall the mandate. They simultaneously moved for us to vacate certain counts of conviction in light of the Supreme Court's decision in *United States v. Davis*[20] and to remand for resentencing.

Also on December 28, 2021, Samia filed a separate motion to recall the mandate in which he simultaneously moved to unconsolidate his appeal from that of the other two Defendants.

On January 7, 2022, we denied the motions to recall the mandate as moot, noting that the District Court's Rule 33 Order had *automatically* restored jurisdiction to our panel pursuant to our remand

---

[18] Gov't Br. Ex. C, at 1–2.

[19] Rule 33 Order, No. 13-cr-521-RA, ECF 792, 796.

[20] 139 S. Ct. 2319 (2019).

order in *Stillwell*.[21] We denied Defendants' motions to vacate and remand, and to unconsolidate, without prejudice. With the cause again before us, we instructed any Defendants wishing to appeal the District Court's Rule 33 Order to submit supplemental letter briefs addressing that issue, and provided a schedule for the parties to respond and reply.

That supplemental briefing was completed March 2, 2022, at which point all three Defendants' fully-briefed initial appeals, as well as Hunter's and Stillwell's appeals from the Rule 33 Order, were all pending before our Court. On March 22, 2022 we heard oral argument.

In a summary order filed the same day as this opinion, we address Defendants' claims in their initial appeals. And we proceed in this opinion to examine in particular the claims of Hunter and Stillwell on appeal of the Rule 33 Order.

## II. DISCUSSION

Rule 33 of the Federal Rules of Criminal Procedure provides that "[o]n the defendant's motion, the court may vacate any judgment and grant a new trial to that defendant if the interest of justice so requires."[22] On such a motion, "[t]he defendant bears the burden of proving that he is entitled to a new trial," and in order to grant a new

---

[21] *See Jacobson*, 15 F.3d at 22 (explaining a mechanism for the "automatic restoration of appellate jurisdiction" following a remand "seek[ing] supplementation of the record").

[22] Fed. R. Crim. P. 33.

trial, "a district court must find that there is a real concern that an innocent person may have been convicted."[23]

As we have explained, "[w]e review challenges to a district court's denial of a Rule 33 motion for an abuse of discretion and accept the district court's factual findings unless they are clearly erroneous."[24]

It is well-established by *Brady* and related authorities that in a criminal prosecution, "the government has an affirmative duty" under the Due Process Clause "to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense."[25] If this obligation is violated, the district court may grant a new trial. That said, not all instances of governmental nondisclosure violate *Brady*, or warrant such relief.[26] "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[27] In other words,

---

[23] *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (citation and internal quotation marks omitted).

[24] *Id.* (citation and internal quotation marks omitted).

[25] *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); see *generally Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

[26] *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).

[27] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial.

Before the District Court and on appeal, the parties agree that the withheld information was "favorable" and dispute only the second and third points. The District Court held that the withheld information was neither "suppressed" within the meaning of *Brady*, nor prejudicial, and therefore denied Defendants' motions. We address both of these conclusions, beginning with prejudice.

### A. Prejudice

Under *Brady*, the prosecution is required to disclose evidence "where the evidence is *material* either to guilt or to punishment."[28] To establish "materiality," a defendant must show that he was prejudiced by the prosecution's failure to disclose.

> Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A "reasonable probability" of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial. In other words, [Defendants] . . . are entitled to a new

---

[28] *Brady*, 373 U.S. at 87 (emphasis added).

17

trial only if they establish the prejudice necessary to satisfy the "materiality" inquiry.[29]

This inquiry presents a mixed question of law and fact.[30] "While the trial judge's factual conclusions as to the effect of nondisclosure are entitled to great weight, we examine the record *de novo* to determine whether the evidence in question is material as a matter of law."[31] We conclude that neither Stillwell nor Hunter have met their burden. The evidence against both of them at trial, considered next to whatever favorable uses they might have had for the withheld information, does not permit us to conclude that there is a "reasonable probability" that even one juror would have voted to acquit either of them.[32]

Hunter and Stillwell both argue that the withheld information would have primarily supplied impeachment evidence against LeRoux. Hunter argues, for example, that "the undisclosed materials . . . demonstrate that LeRoux was a master at manipulating the system," which, if shown to a jury, would have cast doubt on LeRoux's testimony relevant to establishing the jurisdictional element

---

[29] *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (alterations, citations, and some internal quotation marks omitted); *see also Cone v. Bell*, 556 U.S. 449, 469–470 (2009); *Strickler*, 527 U.S. at 290; *United States v. Bagley*, 473 U.S. 667, 677 (1985); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[30] *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005).

[31] *Id.*

[32] *Cf. Cone*, 556 U.S. at 452 (instructing the district court to determine "whether there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment").

18

with regard to Hunter.[33] Stillwell similarly argues that "the jury at a new trial through impeachment [could] conclude that LeRoux" only recanted his "2015 Statement" (that Stillwell was unaware of the purpose of his trip to the Philippines prior to his departure) in order to make himself a more useful government witness.[34] In other words, Stillwell claims the *recantation* was the actual lie, and this argument might have undermined the jurisdictional element of the prosecution's case against him.

We assess these arguments and the withheld information "in light of the entire record,"[35] and easily conclude, as the District Court did, that there was significant additional evidence against both Defendants, such that simply impeaching LeRoux as described would not have sufficed to upset the trial verdict. "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin."[36] Here, substantial other evidence existed to establish the jurisdictional elements of the conspiracy charges as to both Defendants, and LeRoux was already thoroughly impeached at trial. The District Court was therefore correct to deny the Rule 33 motions on remand. We examine in turn the Defendants' arguments in the

---

[33] Hunter Supp. Ltr. Br. 7 & n.4.

[34] Stillwell Supp. Ltr. Br. 5.

[35] *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004).

[36] *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002).

context of other evidence presented against them individually, and then generally discuss the cumulativeness of impeaching LeRoux.

### 1. Hunter

As the District Court explained in its Rule 33 Order, "[t]he jurisdictional case against Hunter . . . did not rest on . . . LeRoux's testimony."[37] Rather, significant additional evidence established that Hunter engaged in the murder conspiracy while in the U.S.

The Government submitted evidence that Hunter had taken Korean Airlines flight 35 to the U.S. on December 10, 2011, and that he met with Samia and Stillwell later that month in North Carolina to plot murders-for-hire in the Philippines. That evidence included records from the Treasury Enforcement Communications Systems ("TECS") database showing Hunter's name and a Korean Airlines manifest indicating Hunter had been on the flight. It also included the testimony of a cooperator from LeRoux's organization, Timothy Vamvakias, who testified to receiving a December 2011 call from Hunter from a Kentucky area-code. Vamvakias testified that Hunter confirmed during the phone call that he was home in Owensboro, Kentucky and stated that he was on his way to "Carolina" to meet with Samia.[38]

Defendants argued extensively at trial that Hunter was not on the Korean Airlines flight, and that he did not actually attend the

---

[37] Rule 33 Order, No. 13-cr-521-RA, ECF 796, at 14.

[38] Joint App'x 768 (Trial Tr. 1209:6–1210:11).

20

December 2011 meeting. Even if we were to accept Hunter's version of the evidence on the December 2011 meeting—which we cannot, given the "great weight" afforded the District Court's factual findings[39]—the Government still presented ample additional evidence to satisfy the jurisdictional element.

Most critically, even though the parties at trial focused intensely on the North Carolina meeting based on its temporal proximity to the Lee murder, the Government established that Hunter began conspiring with LeRoux to commit murders-for-hire as early as December 2009. For example, the Government introduced emails from December 2009 between a former murder-for-hire leader in the LeRoux organization named David Smith, Hunter, and Samia about "bonus" jobs.[40] It further introduced evidence that in the time between December 2009 and December 2011, Hunter remained involved in LeRoux's murder-for-hire conspiracy, eventually replacing Smith in a leadership role.[41] The Government's evidence also showed that Hunter was in the U.S. at multiple points between then and his trip to the Philippines, notably in February 2011.[42]

---

[39] *Madori*, 419 F.3d at 169.

[40] Gov't Hunter Supp. App'x 60-61 (GX 400-20); Joint App'x 564 (Trial Tr. 406:2–407:17)

[41] Joint App'x 565 (Trial Tr. 409:17–410:19); 570-71 (Trial Tr. 431:4–8; 432:14–433:7).

[42] Gov't Hunter Supp. App'x 72 (GX 506), 73 (GX 509); Joint App'x 814 (Trial Tr. 1386:7–1390:2).

In other words, this was a not a case where the Government's ability to establish the jurisdictional element of Hunter's murder conspiracy charge depended on LeRoux's testimony about the December 2011 meeting. To the contrary, in light of the Government's other evidence there is no reasonable probability that disclosure would have caused a different result at trial.

## 2. Stillwell

Similarly, the District Court concluded in its Rule 33 Order that "LeRoux's testimony at trial was not a critical aspect of the government's case against Stillwell as to the jurisdictional element" of the conspiracy charge,[43] and we agree. As with Hunter, Stillwell's presence in the U.S. when he conspired to commit murder was established by multiple items of evidence.

The government submitted substantial evidence from Stillwell's laptop computer, including a file titled "Hitman," kept in a folder titled "Interesting Stuff," which contained instructions on how to commit murder.[44] Those instructions corresponded exactly to the manner in which the Lee murder was carried out. These files were accessed—if not necessarily opened—in October 2011, prior to

---

[43] Rule 33 Order, No. 13-cr-521-RA, ECF 796, at 18 (brackets omitted) (quoting Post-Trial Opinion, 2018 WL 4961453, at *6 n.17).

[44] Joint App'x 695 (Trial Tr. 921:23–25), 702 (Trial Tr. 948:4–950:19).

Stillwell's and Samia's departure from the U.S. for the Philippines.[45] Stillwell then brought the laptop with him to the Philippines and the files were accessed again in February 2012, days before Lee was killed.

The Government also provided evidence that Stillwell and Samia worked together closely while in the U.S. to prepare for their Philippines trip. This included evidence of a phone call between them on September 30, 2011, the same day Samia paid for Stillwell to apply for a passport for the first time in his life. It also included email traffic between Samia, Hunter, and LeRoux, discussing the timing of the Philippines trip in the context of when Samia's "partner" would be "ready" for the two of them to "come [to the Philippines] together for [n]inja stuff."[46] Stillwell essentially argues that he and Samia engaged in this extensive joint preparation for the Philippines, but Samia kept him completely in the dark as to the real reason for the trip, *viz.*, to commit murder. In light of the evidence, and considering that Samia and Stillwell had known each other for more than seven years and worked closely together before, there is not a reasonable probability that disclosure before trial would have produced a different result.

---

[45] Supp. App'x 306 (GX N226-28), 308 (GX N226-30); Joint App'x 696 (Trial Tr. 923:25–924:17); *see also id*. at 717 (Trial Tr. 1009:8–17) (containing testimony that the files may not have been opened).

[46] Supp. App'x 103 (GX 400-46); Joint App'x 576 (Tr. 454:24–455:10). Testimony on the record revealed that "ninja stuff" was a euphemism used by the conspirators to mean murder-for-hire work. Joint App'x 761 (Tr. 1182:4–1183:1).

### 3. Impeaching LeRoux

As a general matter, the withheld information was non-prejudicial not only because other evidence existed to establish the jurisdictional elements of Hunter and Stillwell's crimes, but also because significant impeachment evidence against LeRoux already existed at trial, where he was extensively impeached. In other words, impeachment based on the withheld information would have been cumulative.[47]

As we have previously explained specifically with regard to withheld impeachment evidence, "a new trial is generally not required when the testimony of the witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."[48] In LeRoux's case, the evidence at trial left little doubt that he was untrustworthy. For example, the "2015 Statement"—and LeRoux's recantation of it—was the subject of close cross-examination by attorneys for several of the Defendants.[49]

Attorneys for the Government and several Defendants also cross-examined LeRoux about his vast international criminal

---

[47] *See United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) ("[U]ndisclosed evidence may be cumulative, and hence not material.").

[48] *Payne*, 63 F.3d at 1210 (citation and internal quotation marks omitted).

[49] Joint App'x 611–12 (Trial Tr. 594:21–597:7), 620-21(628:22–629:21)

organization. During the course of that testimony, LeRoux admitted to a host of deceitful and manipulative acts, including murdering a witness; framing individuals for crimes they did not commit; bribing multiple foreign authorities, including a judge; and attempting to secure diplomatic privileges for himself by supporting a coup in the Seychelles. And all of this is to say nothing of the litany of generally violent and nefarious acts to which he also admitted, including arranging for numerous other murders; personally committing murder; extensive trafficking in weapons and narcotics; and dealing in weapons with Iran and North Korea. Hunter and Stillwell would have us believe that additional evidence merely demonstrating that LeRoux was a liar, manipulative, or a perjurer would somehow have been the straw that broke the camel's back with the jury—finally causing them to distrust Paul LeRoux. We are unpersuaded.[50]

---

[50] Our conclusion is unaltered by Stillwell's argument that the withheld information would have shown that LeRoux perjured himself at trial. Stillwell refers to an instance where an unidentified person tells LeRoux that he will "throw the candles to the river." Gov't Br. Ex. B, PC #2012-79691, at 2. LeRoux agrees, and urges his interlocutor to throw "the other steel shit" in the river. *Id*. Stillwell claims that LeRoux and his interlocutor are discussing the disposal of the Lee murder weapon, that LeRoux therefore perjured himself when he testified at trial that the weapon was returned to a warehouse, and that the nondisclosure prejudiced Stillwell by preventing him from making this argument to the jury.

We disagree. Stillwell's argument under *Brady* requires multiple assumptions, including that the word "candles" as used in the communication meant guns and that the guns at issue included the Lee murder weapon. This, despite the fact there was no concrete connection between LeRoux's interlocutor and the Lee murder, and three months had elapsed between the Lee murder and the communication. LeRoux's criminal network and dealings were extensive. The

25

In sum, we recall that, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[51] The withheld information would not have produced a different verdict here, it was not "material" under *Brady*, and the District Court on remand was right to deny Defendants' Rule 33 motions.

## B. Suppression

Because we have determined that the withheld information was not "material," we need not determine whether it was "suppressed" in order to decide this appeal.[52] Still, because the District Court concluded that Defendants established *neither* materiality nor suppression, we briefly examine the latter conclusion.[53]

---

assumptions required to make this communication relevant to the Lee murder and Stillwell's case are not particularly persuasive, especially when taken together.

[51] *See Strickler*, 527 U.S. at 281; *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001).

[52] *See, e.g., United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997) ("We need not decide whether or not the evidence was suppressed, however, because we believe, in any event, that the evidence was not material.").

[53] Rule 33 Order, No. 13-cr-521-RA, ECF 796, at 33 ("Defendants have failed to demonstrate the suppression of evidence or materiality necessary to establish a *Brady* violation.").

"The *Brady* obligation extends only to material evidence . . . that is *known to the prosecutor*."[54] Because "the prosecution . . . alone can know what is undisclosed," it "must be assigned the consequent responsibility to gauge the likely net effect of [undisclosed] evidence and make disclosure when the point of 'reasonable probability' is reached."[55] In other words, the onus is naturally on the prosecutor to determine what must be disclosed. The Supreme Court has thus counseled several times that "the prudent prosecutor will resolve doubtful questions in favor of disclosure."[56]

Moreover, as the Supreme Court explained in *Kyles v. Whitley*,[57] the fact that the prosecutor has a monopoly on potentially material information prior to its disclosure imposes a further burden: "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."[58]

But who is "acting on the government's behalf" in a case? Indeed, we have previously observed that answering this question

---

[54] *Avellino*, 136 F.3d at 255 (emphasis added).

[55] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

[56] *United States v. Agurs*, 427 U.S. 97, 108 (1976); *see also Kyles*, 514 U.S. at 439 ("[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."); *Bagley*, 473 U.S. at 711 n.4 (Stevens, *J.* dissenting) (quoting *Agurs*).

[57] 514 U.S. 419.

[58] *Id.* at 437.

defies "a broad, categorial approach," and instead requires us to "examin[e] the specific circumstances of the person alleged to be an 'arm of the prosecutor,'"[59] or, as we have also articulated it, part of the "prosecution team."[60]

We have long rejected the notion that "knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor."[61] And this circumscription on the *Kyles* duty is ultimately grounded in a prudential concern:

> [K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."[62]

---

[59] *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir.1975)).

[60] *Stewart*, 433 F.3d at 298; *Locascio*, 6 F.3d at 948; *see also Morell*, 524 F.2d at 557 (2d Cir. 1975) (Friendly, J., concurring in part).

[61] *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (record citation omitted), *cert. denied*, 404 U.S. 850 (1971); *accord Locascio*, 6 F.3d at 949 ("[W]e will not infer the prosecutors' knowledge simply because *some* other government agents knew about the [information in question]." (emphasis added)).

[62] *Avellino*, 136 F.3d at 255 (quoting *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996)).

Thus, while a prosecutor has a duty under *Kyles* to learn information when that information is possessed by others on the "prosecution team," undisclosed information that is not known to anyone on that team does not give rise to a *Brady* violation.[63]

We have also made clear that the imputation of knowledge to the prosecutor "does not turn on the *status* of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person *did*, not who the person *is*."[64]

We discussed this point in *United States v. Locascio*,[65] a case in which a team of prosecutors in the U.S. Attorney's Office for the Eastern District of New York ("EDNY") entered into a plea bargain with Salvatore Gravano, the *consigliere* of the Gambino crime family and a cooperator. In his plea, he stated that he had admitted to all the crimes he had committed. Gravano subsequently testified at the trial of Gambino crime family "boss" John Gotti and "underboss" Frank Locascio.

FBI reports prepared by agents working in another district contained evidence that Gravano had, in fact, committed other crimes, in addition to those to which he had confessed. The work of those

---

[63] *See, e.g.*, *Locascio*, 6 F.3d at 949 (declining to find a *Brady* violation where, "[e]ven assuming the reports' materiality, there [wa]s no evidence that the prosecution team in the instant case was aware of the reports . . . .").

[64] *Stewart*, 433 F.3d at 298.

[65] 6 F.3d 924.

agents and the existence of their reports were entirely unknown to the EDNY prosecution team throughout their prosecution of Gotti and Locascio. After sentencing, an EDNY prosecutor encountered the reports, confirmed no one on his prosecution team had been aware of them, and disclosed them to counsel for Gotti and Locascio. They then filed a motion for a new trial, arguing that the government had suppressed favorable, material information in violation of *Brady*. We affirmed the district court's denial of that motion because "there [was] no evidence that the prosecution team . . . was aware of the reports that ha[d] subsequently come to light."[66]

The District Court here, relying in part on *Locasio*, held that this was the sort of situation that faced the SDNY U.S. Attorney's Office. Indeed, we understand the position of the SDNY prosecutors, and also their frustration—the protective order sought and obtained by the Washington-based NDDS from the District Court specifically *barred* the disclosure of the withheld information to prosecutors from that office.

The harder question, however, is whether the NDDS—and the DEA agents in the DEA-SPS who possessed the undisclosed information—should *themselves* be considered part of the prosecution team, SDNY's position to the contrary notwithstanding.

We disagree with Defendants' suggestion that the question should be answered in the affirmative because "the DEA-BIU . . . and

---

[66] *Locascio*, 6 F.3d at 949.

30

the DEA-SPS . . . are part of the same subdivision of the DEA, i.e.[,] the DEA-SOD."[67] This "bureaucratic proximity" argument may be relevant in other circumstances, but as a general matter, and as applied in this case, it tells us little about the actual relationship between the prosecutors on the one hand, and the agencies, divisions, and subdivisions at issue, on the other.[68] Relying solely on bureaucratic proximity would ultimately undercut our clear pronouncement in *Stewart* that "the relevant inquiry is what the person *did*, not who the person *is*."[69]

However, *Stewart* simultaneously informs our skepticism that the withheld material was not "suppressed." If we are to look at what the DEA-SPS and attorneys from the NDDS *actually did*, then we should start—most obviously—with their decision to approach the District Court and seek a protective order for their withheld information.

Limiting disclosure obligations to the "prosecution team" prudently prevents a prosecutor from needing to search the "whole-of-government" for possibly material information in myriad cases and controversies before the courts. Such an obligation would clearly be an unworkable encumbrance on the system of justice. Whether an item of

---

[67] Hunter Supp. Ltr. Br. 5–6 (emphasis omitted).

[68] *Cf. Quinn*, 445 F.2d at 944 (rejecting an argument for the imputation of knowledge based on departmental commonality and noting that the "Department of Justice alone has thousands of employees in the fifty States of the Union").

[69] 433 F.3d at 298.

information is material is the sort of thing a member of the "prosecution team" can (and must) know—not the sort of thing a far-flung member of the executive branch can (or can be expected to) know. Here, though, such concerns about the NDDS's ability to determine its own relevance, and that of the information in the DEA-SPS's possession, are not present, because it was *the NDDS that approached the court.* Unexpected and unbidden, they—in effect—proclaimed their relevance. And despite that, they then asked the courts to approve their nondisclosure. Clearly *someone* at NDDS thought they or their information might be relevant in the case pending in the SDNY, or they would not have thought to come to the District Court (or us) *ex parte* and *in camera* at all.

In this published opinion, we express our doubt that the NDDS—or any similarly-situated organ of the executive branch, for that matter—having stepped out of the shadows at least to the extent of asking the judiciary to bless its act of nondisclosure, even from local prosecutors and agents in the case, could then successfully draw a curtain of secrecy over "evidence . . . material either to guilt or to punishment" by invoking our *Brady* jurisprudence.

To the extent filings and arguments before the District Court suggest that the NDDS, in the normal course of its business, seeks protective orders such as the one at issue here, we are troubled. By contrast, we were encouraged to learn from SDNY prosecutors at the most recent oral argument in our Court on this matter that our message of concern "has been delivered both to the Department of Justice and to the NDDS by the executive leadership" of the SDNY,

32

and that "the message has been received." Oral Arg. at 48:20-40. As we suggested in *Stillwell* and re-affirm here, we strongly question whether—had the withheld information been material—our jurisprudence circumscribing the "prosecution team" would have been adequate to protect Defendants' rights in the circumstances presented here.[70]

Ultimately, however, we raise this question only by way of *caveat*. It is clearly not necessary for us to answer this question today. Because we have firmly concluded that the withheld information was not prejudicial, it was not "material" information under *Brady*, and we are able to affirm the District Court's Rule 33 Order on that basis.

---

[70] This is not the first time our court and district courts in this circuit have raised such concern. *See United States v. Zagari*, 111 F.3d 307, 320 n. 13 (2d Cir. 1997) ("The extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear."); *see also United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("There is no clear test to determine whether or not an individual or agency is a member of the prosecution team."); *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013) (same); *United States v. Bin Laden*, 397 F. Supp. 2d 434, 484 (S.D.N.Y. 2013) (noting the Second Circuit is "lacking a clearly articulated imputation test"); *Chandras v. McGinnis*, No. 01 Civ. 2519(LBS), 2002 WL 31946711, at *7 (E.D.N.Y. Nov. 13, 2002) ("[T]he exact point at which government agents can fairly be categorized as acting on behalf of the prosecution . . . is uncertain."). One has only to imagine the information in NDDS's possession being actually exculpatory rather than cumulatively impeaching to bring this concern into sharp relief.

## III. CONCLUSION

To summarize:

1.  We hold that the withheld information was not prejudicial, and it was therefore not "material" information under *Brady*.
2.  We **AFFIRM** the District Court's December 14, 2021 order denying Defendants' Rule 33 motions for a new trial.
3.  The cause is **REMANDED** for resentencing, pursuant to the summary order entered the same day this opinion is filed, for reasons explained in that summary order.